UNITED STATES of
America, Plaintiff,

v.

Norma Mae GALLAGHER, Defendant.

Cr. No. 89–285–FR.

United States District Court,
D. Oregon.

July 25, 1990.

Charles H. Turner, U.S. Atty., Stephen F. Peifer, Asst. U.S. Atty., Portland, Or., for plaintiff.

Charles J. Wiseman, Portland, Or., for defendant.

## OPINION

FRYE, District Judge:

The matter before the court is the motion of plaintiff, the United States of America, for a mistrial based upon the doctrine of manifest necessity.

### FACTS

Defendant, Norma Mae Gallagher, is charged with the crimes of conspiracy, arson, and mail fraud. The charges against Gallagher stem from a fire that destroyed the Crab Pot Restaurant and Lounge (the Crab Pot) in Warrenton, Oregon on February 11, 1988. Gallagher had a financial interest in the Crab Pot, and she and her stepson, Daniel Gallagher, maintained two fire insurance policies on the premises. The theory of the government is that Gallagher hired Roger Wayne McLaughlin to burn down the Crab Pot so that she could collect on the insurance policies.

McLaughlin had agreed prior to trial to testify pursuant to a cooperation agreement with the government. Prior to trial, both of the parties, as well as the court-appointed counsel for McLaughlin, expected that McLaughlin would testify. In fact, McLaughlin had so indicated to counsel for the government shortly before trial began.

Trial began on the morning of May 9, 1990. In their opening statements to the jury, both counsel for the government and counsel for Gallagher stated that the testimony of McLaughlin was crucial. McLaughlin is serving a sentence of sixty-seven months in a federal penitentiary for the crime of arson. Both counsel referred to McLaughlin and his anticipated testimony at length during their opening statements.

The government called McLaughlin as a witness in the mid-afternoon of the first day of trial. After answering some preliminary questions about his present sentence and his prior criminal history, McLaughlin abruptly volunteered, "I need to say what kind of liar I am, you know, my testimony on the stand probably won't be any good. I'll lie about anything that would get me in trouble or whatever." McLaughlin then asked to speak to his lawyer, and the court sent the jury to the jury room.

After consulting with his lawyer, McLaughlin stated that he declined to answer any questions about the cause of the arson on fifth amendment grounds. The government asked McLaughlin why he had set the fire, and he again refused to answer but stated that he had made the decision not to testify just prior to taking the stand.

The government then presented to the court a written motion to compel McLaughlin to testify pursuant to 18 U.S.C. §§ 6001 et seq. The court granted the motion and immediately signed an order compelling McLaughlin to testify. The court then explained the order to McLaughlin, warning him about the possibility of civil and criminal contempt if he continued to refuse to testify. McLaughlin nevertheless refused to testify, and the court found him in contempt. The United States Marshal removed him from the courtroom.

When the jury returned, the court informed the jurors that McLaughlin had refused to testify despite a court order and had been found in contempt of court and sentenced. The government then called another witness before the court recessed for the evening. The next morning, McLaughlin again refused to testify, and so the government offered a tape recording of a statement made by McLaughlin to an informant who was wearing a "wire." The court sustained the objection to this evidence made by counsel for Gallagher.

The government then moved for a mistrial on the basis of manifest necessity. Gallagher objected to the motion for a mistrial and moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29. The court declared a mistrial and discharged the jury, but took the issue of manifest necessity under advisement pending briefing by the parties.

## ANALYSIS AND RULING

The double jeopardy provision of the fifth amendment bars retrial of a criminal defendant after a mistrial is granted over the objection of the defense, unless there is "manifest necessity" for the mistrial. *United States v. Shaw,* 812 F.2d 1182, 1187 (9th Cir.1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988). The fifth amendment's prohibition against placing a defendant twice in jeopardy was designed to prevent repeated prosecutions for the same offense, subjecting the defendant to "embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971).

However, the courts have also recognized that a criminal trial is, even under the best of circumstances, a complicated affair to manage, so that it would be inappropriate to impose a mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent. *Id.* at 479–80, 91 S.Ct. at 554–55. Thus, the Supreme Court has stated that "a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

The doctrine of manifest necessity was first set out in the early case of *United States v. Perez*, 9 Wheat (22 U.S.) 579, 6 L.Ed. 165 (1824), in which the Supreme Court held that a defendant could be retried after the judge, over the defendant's objection, excused a jury which could not agree upon conviction or acquittal. Justice Story wrote:

> We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office.

*Id.* at 579.

Although most cases of manifest necessity have concerned problems with a jury, such as the failure of the jury to agree on a verdict or the disqualification of a juror, several decisions have discussed manifest necessity in situations where a witness was unavailable to testify. In *Cornero v. United States*, 48 F.2d 69 (9th Cir.1931), the Ninth Circuit found that there was no manifest necessity where a district attorney proceeded to impanel a jury without ascertaining whether two indispensible witnesses were present. The two witnesses were co-defendants of Cornero who had pled guilty and who were released on bond pending sentencing. The district attorney did not subpoena these witnesses for the trial, and was unable to locate them although the court granted a continuance of several days. The court then discharged the jury.

The Ninth Circuit reviewed the cases decided under the doctrine of manifest necessity and held that "mere absence of witnesses discovered after the jury is impaneled is insufficient to deprive the accused of his right to claim former jeopardy upon a subsequent trial where the jury is discharged without his consent and notwithstanding his objection." 48 F.2d at 73. The Supreme Court later disapproved this "rigid formula," stating that the principles of *Perez* command courts to take all circumstances into account and "thereby forbid the mechanical application of an abstract formula." *Wade, supra,* 336 U.S. at 691, 69 S.Ct. at 838.

The facts in *Wade* concern a court-martial which was held in Germany during the final months of World War II. The court-martial commenced, evidence was taken, and then the proceeding was continued until additional witnesses could be heard. Before the court-martial was reconvened, the Commanding General of the 76th Division withdrew the charges and transmitted the charges to the Commanding General of the Third Army for retrial, citing tactical reasons for this action. The Court based its finding of manifest necessity on the extraordinary requirements of an army in the course of an invasion, but left open the possibility that manifest necessity could be based on the absence of witnesses in some circumstances. 336 U.S. at 691–92, 69 S.Ct. at 838–39.

The Supreme Court next addressed the unavailability of witnesses in *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). In *Downum*, a witness whose testimony was necessary for two out of six charges against the defendant did not appear on the day of trial. The prosecution had issued a subpoena for the witness, Rutledge, but knew that he had not been located as of the day before the trial. After the jury was impaneled the prosecution asked that the jury be discharged due to the absence of Rutledge.

Downum moved that the two counts dependent on the testimony of Rutledge be dismissed, and that the trial continue on the rest of the counts. The court denied this motion and discharged the jury over the objection of Downum.

The Supreme Court found that there was no manifest necessity because the prosecution had allowed the jury to be impaneled without assuring that Rutledge was present, and because Rutledge was not a necessary witness as to four out of the six counts against Downum.[1] 372 U.S. at 737–38, 83 S.Ct. at 1035–36. Again, the Court refused to say that the absence of witnesses can never justify discontinuance of a trial. Id. at 737, 83 S.Ct. at 1035.

In two more recent cases, Courts of Appeals have found manifest necessity where a witness was unavailable and where there was no fault on the part of the prosecution. In United States ex rel. Gibson v. Ziegele, 479 F.2d 773 (3d Cir.), cert. denied, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973), the Third Circuit found that there was manifest necessity for a mistrial where a key witness became too ill to testify after the trial began. The Third Circuit found that the illness of the witness was sudden, that the illness precluded the witness from testifying for at least two weeks, and that the witness was essential to the case. Id. at 777.

In Shaw, supra, 812 F.2d 1182, the Ninth Circuit found manifest necessity under circumstances which are similar in many respects to the facts of this case. Shaw was charged with illegal possession of a weapon. On the day before trial, the main prosecution witness, Sharon Rose, informed the court that she would invoke her fifth amendment privilege against self-incrimination. The prosecution sought immunity for Rose, but when the trial began it was uncertain whether immunity would be approved. Therefore, the judge cautioned the prosecution not to discuss any facts in opening statements that could only be presented through the testimony of Rose. The prosecution refrained from discussing the expected testimony of Rose, but defense counsel made repeated references to the testimony and credibility of Rose in his opening statement.

On the following day, immunity was approved, and the judge ordered Rose to testify. Rose refused to testify, and the prosecutor moved for a mistrial. The court granted the motion for mistrial over Shaw's objections, ruling that neither an instruction to the jury to disregard portions of the opening statements of defense counsel nor the introduction of the grand jury testimony of Rose could cure the prejudice to the government's case.

The Ninth Circuit found that the trial judge exercised sound discretion in granting the mistrial on the grounds of manifest necessity because 1) there was no effective means to cure the prejudice to the government's case caused by the references to Rose in the opening statement; 2) the prosecution's failure to obtain immunity for Rose before trial could not be characterized as negligence or undue delay; and 3) the prosecution obeyed the judge's warning to refrain from references to Rose and did not in any way invite the prejudicial remarks of defense counsel. 812 F.2d at 1188.[2]

This case has elements of both Shaw and Gibson. As in Gibson, the testimony of a key witness became unavailable after the jury was impaneled. Although the witness was not unavailable due to illness, the Shaw decision indicates that the refusal of a witness to testify may constitute unavailability for the purposes of a finding of manifest necessity. As in both Shaw and Gibson, the unavailability of the witness was unexpected, arose after the beginning of the trial, and was not due to any fault on the part of the government. Here, the government reasonably believed that

---

1. The court noted that the facts in Downum were similar to the facts in Cornero, and indicated that although the rigid standard of Cornero had been disapproved, the result in Cornero would be the same if the proper standard was applied. 372 U.S. at 737, 83 S.Ct. at 1035.

2. The Shaw decision does not analyze the importance of Rose as a witness, and did not base the finding of manifest necessity on that ground, although the decision refers to Rose as "the main prosecution witness." 812 F.2d at 1186.

McLaughlin would testify when the trial began. There is no evidence that the prosecutor is using the superior resources of the government to harass or to achieve a tactical advantage over Gallagher.

As in both *Shaw* and *Gibson*, there was no practical alternative to a motion for a mistrial in this case. The government was justifiably surprised by the refusal of McLaughlin to testify, and was not prepared to go forward without his testimony. There is no doubt that McLaughlin, the only person who can link Gallagher to the arson of the Crab Pot, is a key witness. Gallagher argues, however, that McLaughlin is an untrustworthy witness who may never decide to testify, and that it is fundamentally unfair to require Gallagher to agonize over the possibility of another trial which would again depend on the testimony of McLaughlin. However, the court does not have evidence before it which would justify a finding that McLaughlin will never agree to testify.

Moreover, as in *Shaw*, the trial in this case was affected not only by the refusal of a witness to testify, but by the prejudicial effect of references to the anticipated testimony in the opening statements. Even if the government could have proceeded without McLaughlin, the emphasis placed on the testimony of McLaughlin in the opening statements was so great that no admonition to the jury would have been sufficient to cure the prejudice to the government caused by the failure of McLaughlin to testify. The testimony that McLaughlin might have given was further emphasized in the eyes of the jury by the dramatic manner in which McLaughlin first labeled himself a liar, and then refused to answer questions.

Although the facts in this case are a little different from the facts in *Shaw* because in this case both attorneys discussed McLaughlin's testimony in the opening statements, the court finds that the government acted reasonably and did not invite the prejudicial effect of the opening statements. In contrast to *Shaw*, neither of the parties in this case anticipated that McLaughlin might refuse to testify, and therefore the government was not able to avoid the prejudicial effect of the emphasis on McLaughlin's testimony.

This is not a case like *Cornero* or *Downum*, in which the prosecution took a chance that a witness could be located in time for a trial despite knowledge or suspicion that the witness might be unavailable. Nor is this a case like *Bretz v. Crist*, 546 F.2d 1336, 1348 (9th Cir.1976), where the prosecution sought a mistrial to gain the tactical advantage of having two charges tried together, although the trial could have proceeded as to one of the charges.

In conclusion, the court finds that there was manifest necessity for the granting of the motion for mistrial in this case, and that retrial of Gallagher is consistent with the public's interest in fair trials designed to end in just judgments. *See Wade, supra*, 336 U.S. at 689, 69 S.Ct. at 837.

## CONCLUSION

The government's motion for a mistrial based upon the doctrine of manifest necessity is granted.